# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

PAUL DANIEL SHIELDS,       )
                                  )
        Plaintiff,             )          Case No. 3:14-cv-02193
                                  )          Senior Judge Haynes
v.                               )
                                  )
CAROLYN W. COLVIN,        )
Acting Commissioner of Social Security,  )
                                  )
        Defendant.           )

## MEMORANDUM

Plaintiff, Paul Daniel Shields, filed this action under 42 U.S.C. § 405(g) against the Defendant Carolyn Colvin, Acting Commissioner of Social Security, seeking judicial review of the Commissioner's denial of his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act.

Before the Court is Plaintiff's motion for judgment on the record (Docket Entry No. 12) contending, in sum, that the Administrative Law Judge ("ALJ") erred in his analysis of Plaintiff's treating physician's opinion; by failing to consider all of Plaintiff's impairments and determine their severity; and by failing to determine a function-by-function evaluation of Plaintiff's residual functional capacity ("RFC"). The Commissioner contends that the ALJ's decision is supported by substantial evidence.

After the evidentiary hearing, the ALJ evaluated Plaintiff's claim for DIB and SSI using the sequential evaluation process set forth at 20 C.F.R. § 416.920. (Docket Entry No. 10, Administrative Record at 12).[1] The ALJ determined that Plaintiff met the insured status requirements through

---

[1]The Court's citations are to the pagination in the Administrative Record, not in the electronic case filing system.

March 31, 2012. Id. at 13. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since November 3, 2008, the alleged onset date. Id.

At step two, the ALJ determined that Plaintiff has the following severe impairments: degenerative disc disease of the cervical, thoracic, and lumbar spine with an unrelated but complicating history of lipoma on the back during the period at issue. Id.

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments found in 20 C.F.R. Part 404, Subpart P, Appendix 1. Id. at 15.

At step four, the ALJ determined that Plaintiff had the residual functional capacity to understand, remember, and carry out simple tasks and instructions; to occasionally lift twenty pounds and frequently lift ten pounds; to stand and walk in thirty minute intervals up to four hours per eight-hour workday and sit in thirty minute intervals for up to four hours per eight-hour workday (thus requiring a sit/stand option); to occasionally perform postural activities; further, Plaintiff should avoid concentrated exposure to extreme temperatures, fumes, dust, gas, and inhalants. Id.

At step five, the ALJ stated that Plaintiff is not capable of performing past relevant work, but is capable of performing jobs that exist in significant numbers in the national economy. Id. at 20. The ALJ concluded that Plaintiff was not disabled within the meaning of the Act and was not entitled to DIB or SSI. Id. at 21. Plaintiff requested a review of the ALJ's decision and on September 9, 2014 the Appeals Council denied Plaintiff's request for review. Id. at 1-5, 6-7.

## A. Review of the Record

Plaintiff's alleged onset date of disability is November 3, 2008. (Docket Entry No. 10, Administrative Record, at 139). Plaintiff submitted medical records predating the alleged onset date

of disability. Id. at 223-85. Plaintiff's earliest submitted medical record after the onset date is dated October 8, 2009. On October 8, 2009, Plaintiff had an initial visit with Dickson Medical Associates. Id. at 479. Plaintiff "moved to Dickson in February. Has been seeing Dr. Allen Walker in White House, but he will no longer be seeing pain [management] patients." Id. Plaintiff reported that he "has [degenerative disc disorder], 3 [motor vehicle accidents], has had injections [no] help, scared to do surgery." Id. On December 10, 2009, Plaintiff returned to Dickson Medical Associates. Id. at 476. Plaintiff needed medication refills; the medications prescribed are illegible. Id.

On January 12, 2010, Plaintiff returned to Dickson Medical Associates with complaints of lower back pain and neck pain. Id. at 475. Plaintiff stated that his prescription for Nortriptyline, an anti-depressant and nerve pain medication, was giving him an "upset stomach [and] hang over in [the morning]" but that "stopped 4 days after taking med[ication]." Id. Plaintiff's prescriptions were refilled, but Lyrica, a nerve pain medication, was added. Id.

On February 10, 2010, Plaintiff returned to Dickson Medical Associates reporting that Lyrica, a nerve pain medication, "seems to be helping" and he "needs samples." Id. at 474. Plaintiff continued with his report of back pain for which his physician prescripted Lortab, a narcotic pain medication. Id.

On March 10, 2010, Plaintiff returned to Dickson Medical Associates with complaints of back pain and a headache. Id. at 473. Plaintiff stated that Advil and Motrin did not help, and he needed a refill of Lortab, a narcotic pain medication. Id. Plaintiff was prescribed Lortab and other medications. Id. On April 9, 2010, Plaintiff returned to Dickson Medical with reported back pain because he "recently moved [and] played football." Id. at 472.

On May 5, 2010, Plaintiff visited Pain Management of Middle Tennessee ("PMMT"). Id.

3

at 326-29. Plaintiff's visit was for follow up for his "depressive disorder," and complaints of "lower back pain, neck pain, upper back pain." Id. at 326. Plaintiff stated that he had previously been on a pain management program, but that program became too expensive. Id. at 328. Plaintiff's wife now had insurance and Plaintiff wanted to begin another pain management program. Id. Plaintiff's medical record reflects that "his [primary care provider] [was] not comfortable prescribing what Dr. Walker prescribed 120 Lortab per month." Id. On examination, Plaintiff was "ambulating normally and [had a] normal tandem gait test." Id. Yet, Plaintiff also "declare[d] he walks with a limp." Id. Plaintiff's neck was "tender and [with] pain with motion[.]" Id. Plaintiff demonstrated tenderness at his spine and hips. Id.

On July 5, 2010, Plaintiff visited the Horizon Center Emergency Department and underwent a chest x-ray and a right shoulder radiograph that were both "[n]ormal." Id. at 430-31. Plaintiff's medical record reflects that Plaintiff "denies injury. Onset 2 days ago, now has a knot on [right] upper back." Id. at 432. Plaintiff was discharged with an instruction to make an appointment with his primary care provider, and to use moist heat, muscle rub, and massage on his shoulder knot. Id. at 435.

On August 5, 2010, Plaintiff visited Pain Management of Middle Tennessee. Id. at 323-25. Plaintiff's visit was a follow up for his "depressive disorder," "cervicalgia," "displacement of thoracic or lumbar intervertebral disc without myelopathy; thoracic intervertebral disc without myelopathy," "chronic pain due to trauma," and "lumbago." Id. at 323. Plaintiff reported constant "sharp; tingling; dull" neck pain at a level of six out of ten due to a recent fall. Id. at 324. Plaintiff noted that he could experience a fifty percent reduction in pain with medication, but that medication did not enable him to resume all activities of daily living. Id. The medical entry reflects that

4

Plaintiff was "taking more [medication] than prescribed, ran out of MS Contin 4-5 days early," and that Plaintiff "tripped up the stairs but state[d] that is not due to being too drugged-up." Id. at 325. On this visit, Plaintiff reported "mild distress" but was "ambulating normally and [had a] normal tandem gait test." Id. On examination, Plaintiff's neck was "tender and [had] pain with motion." Id.

On September 2, 2010, Plaintiff returned to Pain Management of Middle Tennessee. Id. at 320-22. Plaintiff's visit was a follow up for "cervicalgia," "displacement of thoracic or lumbar intervertebral disc without myelopathy; thoracic intervertebral disc without myelopathy," "chronic pain due to trauma," and "lumbago." Id. at 320. Plaintiff was prescribed an anti-anxiety and an anti-insomnia medication. Id. Plaintiff reported neck pain and a "knot" on his right shoulder blade that was "constant," "throbbing" and that he rated as an eight out of ten. Id. at 321. With medication, Plaintiff reported an eighty percent improvement in pain and an improved ability to perform daily living activities. Id. On examination, Plaintiff demonstrated a "normal tandem gait test," but "limited ambulation (walks with limp)." Id. at 322. Plaintiff had a "tender" neck that was "pain[ful] with motion." Id.

On October 4, 2010, Plaintiff returned to PMMT for a follow up examination of his "cervicalgia," "displacement of thoracic or lumbar intervertebral disc without myelopathy; thoracic intervertebral disc without myelopathy," "chronic pain due to trauma," and "lumbago." Id. at 317-19. Plaintiff was prescribed several pain medications. Id. Plaintiff reported "dull," "constant" neck pain that did not rise to the earlier pain that he rated as an eight out of ten. Id. at 318. Medication relieved Plaintiff's pain by sixty percent. Id. On examination, Plaintiff demonstrated a "normal tandem gait test," but "limited ambulation (walks with limp)." Id. at 319. Plaintiff's neck was

"tender, [with] pain with motion, and muscle rigidity." Id. Plaintiff also deomstrated spine and hip tenderness. Id.

On December 27, 2010, Plaintiff underwent an x-ray that revealed "mild [degenerative disc disorder]," and "[a]lso mild evidence of [disc] narrowing of neural foramina on [right] [at] C6-7 [and] on [left] [at] C5-6." Id. at 314 and 397.

On January 3, 2011, Plaintiff visited PMMT for a follow up examination of his "cervicalgia," "displacement of thoracic or lumbar intervertebral disc without myelopathy; thoracic intervertebral disc without myelopathy," and "chronic pain due to trauma." Id. at 314, 315-17. Plaintiff was prescribed pain medications, and his prescriptions for an anti-anxiety and an anti-insomnia medication were renewed. Id. Plaintiff complained of pain in his "mid back" and "neck," that was "throbbing." Id. at 315. Plaintiff noted his constant pain at a level of eight out of ten and interfered with his ability to sleep. Id. Plaintiff explained that pain medication relieved his pain by seventy percent and improved his ability to perform his daily living activities. Id. at 316. Plaintiff's neck was "tender" and he experienced "pain with motion, and muscle rigidity[.]" Id. On this visit, Plaintiff stated that "he would [like] fewer pain medications and desires to have the injections as appropriate for his severe neck pain." Id.

On January 5, 2011, Plaintiff applied for Social Security benefits. Id. at 68.

On January 16, 2011, Plaintiff underwent a chest x-ray, a right elbow radiograph, and a lumbar spine radiograph; but each showed "[n]o acute abnormality." Id. at 413-15. Plaintiff also underwent a thoracic spine radiograph based on his severe back pain. Id. at 416. This radiograph showed "[n]o acute fracture or dislocation. Lower thoracic levoscoliosis. Scattered osteophyte formation with multilevel facet arthropathy. Incidentally noted are degenenerative changes in the

6

cervical spine. Normal soft tissues." Id. This report concluded, "[n]o finding to suggest acute fracture or dislocation." Id.

On March 1, 2011, Plaintiff visited PMMT for a follow up examination of his "depressive disorder," "cervicalgia," "displacement of thoracic or lumbar intervertebral disc without myelopathy; thoracic intervertebral disc without myelopathy," "chronic pain due to trauma," and "lumbago." Id. at 311, . Plaintiff was prescribed, or had renewed, several pain medications. Id. Plaintiff reported low back pain that he described as dull and constant, and rated at a level of five out of ten. Id. at 312. Plaintiff's pain was alleviated by rest. Id. Plaintiff could complete activities of daily living with medication. Id. Plaintiff was able to "ambulat[e] normally and [had a] normal tandem gait test." Id. at 313. Plaintiff's only musculoskeletal limitation was in his "cervical spine ... with lateral rotation." Id. Plaintiff also experienced "pain [in his] thoracic facets with facet-loading." Id.

On March 8, 2011, Plaintiff completed a disability report. Id. at 155-64. Plaintiff listed his physical and mental conditions as "spinal degener[ative] di[s]ease, t4 t5 t5 in spin[e] rubbing bone[.]" Id. at 156. Plaintiff wrote that he stopped working on November 3, 2008 "[b]ecause of my condition(s)." Id. at 156. Plaintiff described his two medications as Lortab and Morphine. Id. at 158.

On March 21, 2011, Plaintiff completed a function report. Id. at 165-72. When asked how his condition limited his ability to work, Plaintiff wrote, "standing for or sitting for a long period of time is very painful. Sleep is disturbed all [through] the night. My wife has to help me out of bed. She leaves early so getting up takes a while and it take[s] about 2 or 3 hours for me to be able to start moving around." Id. at 165. Plaintiff remarked that he was limited in his ability to lift, squat, bend, stand, walk, sit, kneel, and climb stairs; his "back affect[s] all these. I have checked standing to[o]

long, sitting to[o] long is painful." Id. at 170. Plaintiff stated that he could walk for "a block" before needing to stop and rest for "a few min[utes]." Id. Plaintiff wrote that he used a cane and a brace/splint; "[b]race when I am up cane to get up with[.]" Id. at 171.

On June 8, 2011, Plaintiff was examined by Tennessee Disability Determination Services. Id. at 330. Plaintiff appeared "[r]obust healthy appearing" and "moved from seated to standing unremarkably." Id. Plaintiff "demonstrate[d] cervical spine rotation right and left 70 degrees, flexion 45 degrees, extension 55 degrees," but Plaintiff's "[e]fforts d[id] not appear reliable." Id. Again, Plaintiff "demonstrate[d] dorsiflexion at 30 degrees, left and right lateral flexion 10 degrees, and extension 10 degrees," but Plaintiff's "[e]ffort [was] not reliable." Id. Plaintiff also "demonstrate[d] normal straightaway walking, toe walking, heel walking, one-foot stand, and Romberg test. No assistive devices are required." Id.

On June 24, 2011, Dr. Janet Pelmore completed a physical RFC for Plaintiff. Id. at 331-40. According to Dr. Pelmore, Plaintiff was limited to lifting and/or carrying fifty pounds occasionally and twenty-five pounds frequently; standing and/or walking about six hours in an eight-hour workday; sitting about six hours in an eight-hour workday; and unlimited ability to push and pull. Id. at 332. Dr. Pelmore did not impose on Plaintiff any postural, manipulative, visual, communicative, or environmental limitations. Id. at 333-35. Dr. Pelmore concluded, "[c]laimant['] s complaints are partially credible as ASE exam reveals poor effort on testing. Totality of evidence shows a multi-[year] [history] of pain complaints post [motor vehicle accident], which are not of disabling severity. [Claimant] will be able to sustain full work day of 8hrs/ 40 hr week at RFC level." Id. at 338.

On June 30, 2011, Plaintiff visited PMMT for a follow up examination for his "chronic pain

due to trauma," "displacement of thoracic or lumbar intervertebral disc without myelopathy; thoracic intervertebral disc without myelopathy," "depressive disorder," "cervicalgia," and "lumbago." Id. at 374, . Plaintiff reported sharp, constant low back pain that he noted as ten out of ten. Id. at 376. Plaintiff reported a sixty percent improvement in his pain with medication, and an improvement in his ability to complete activities of daily living- with medication. Id. On examination, Plaintiff was "ambulating normally" and had a "normal tandem gait test." Id. Plaintiff's neck was "tender and [had] pain with motion," and was "tender in all planes with extremes of motion." Id.

On July 27, 2011, Plaintiff underwent a psychological evaluation at the Department of Disability Services with Mistie D. Germek, Ph.D., H.S.P. Id. at 341-49. Plaintiff did not bring medical records for this evaluation. Id. at 341. Plaintiff "was shifting in seat due to apparent discomfort or pain. [Plaintiff] walked slowly and displayed a staggering gait." Id. Regarding sleep, "[Plaintiff] state[d] that he typically gets 3 hours of sleep. He state[d] that he does not use sleeping medication. [Plaintiff] state[d] that he is in too much pain to get good sleep." Id. at 342. Regarding activities of daily living, "[Plaintiff] report[ed] that some days he is able to get out of bed, do chores around the house and do the yard work, but other days he is not. He state[d] he is in so much pain that he can't do much physically. He also report[ed] 'my wife does it all, I have a good wife, but I need to work, I want to work but I can't because I hurt so much.'" Id. at 343. Dr. Germek concluded:

> [Plaintiff] appeared to be a good historian.
>
> [Plaintiff] appears to fall into the low average range of intellectual functioning. He showed evidence of mild impairment in his short-term memory. He showed evidence of moderate impairment in his ability to sustain concentration. He showed no evidence of impairment in his long-term and remote memory functioning, and easily recalled numerous experiences from his past.

9

His current psychiatric state was euthymic. He shows evidence of a mild impairment in his social relating. He appears to be mildly impaired in his ability to adapt to change and manage stress. He appears able to follow instructions, both written and spoken. He appears to have had an inconsistent work history, with his longest job lasting 2 years from 1997-1999. He states he has never been fired from a job. He appears able to handle finances. He denies a history of head trauma.

Id. at 345.

Dr. Germek also completed a medical source statement of ability to do work-related activities (mental). Id. at 346-49. Dr. Germek checked "yes," that Plaintiff was limited in his ability to understand, remember, and carry out instructions, but explained that mild limitations existed in Plaintiff's ability to understand and remember simple instructions, carry out simple instructions, and the ability to make judgments on simple work-related decisions, and that moderate limitations existed in Plaintiff's ability to understand and remember complex instructions, carry out complex instructions, and the ability to make judgments on complex work-related decisions. Id. at 346. Dr. Germek checked that "yes," Plaintiff was limited in his ability to interact appropriately with supervisors, co-workers, and the public, as well as respond to changes in the routine work setting. Id. at 347. Specifically, Dr. Germek determined that Plaintiff had a mild limitation in his ability to interact appropriately with the public, supervisors, and co-workers, and in his ability to respond appropriately to usual work situations and to changes in a routine work setting. Id.

On August 10, 2011, George Davis, Ph.D. conducted a psychological review. Id. at 350-63. Dr. Davis concluded that Plaintiff's impairment was "not severe," based on his analysis of Plaintiff's "affective disorder," specifically "depressive [disorder]." Id. at 350, 353. Dr. Davis found that Plaintiff had a "mild" limitation in "difficulties in maintaining concentration, persistence, or pace," but lacked any limitation in his "restriction of activities of daily living" or "difficulties in

maintaining social functioning." Id. at 360. Dr. Davis concluded:

> Claimant has a depressive [disorder] by [history] but currently is euthymic. Has
> [alcohol] dependence in remission. Not significantly limited based on report and
> observations. Panelist opines moderate limitations in concentration, persistence and
> pace but based on no mental health signs/symptoms. Clearly depression is not severe
> as claimant was euthymic. Claimant has a low average IQ by estimate.

Id. at 362.

On August 11, 2011, an examiner with the Disability Determination Services ("DDS")

completed a vocational analysis worksheet. Id. at 181-83. The DDS examiner limited Plaintiff to

the "medium" exertional limitations of lifting fifty pounds maximum, twenty-five pounds frequently;

standing/walking for six hours a day; and sitting for six hours a day. Id. at 181. The examiner did

not list any pushing/pulling restrictions. Id. Plaintiff was not given postural, manipulative, visual,

communicative, or environmental limitations. Id.

On August 12, 2011, Plaintiff's application for Social Security benefits was denied. Id. at

68-69; 75-80. Plaintiff applied for reconsideration of this decision.

On August 31, 2011, Plaintiff visited Pain Management of Middle Tennessee for "chronic

pain due to trauma," "displacement of thoracic or lumbar intervertebral disc without myelopathy;"

thoracic disc without myelopathy," "cervicalgia," and "lumbago." Id. at 371-74. Plaintiff reported

sharp, constant neck and mid-back pain. Id. at 372-73. Plaintiff's pain was at a level of eight out

of ten, but was relieved with medication. Id. at 373. On examination, Plaintiff's neck was "tender

in all planes with extremes of motion, but his "joints, bones, and muscles" showed no tenderness and

his hips were normal. Id. Plaintiff's back had "increased pain with facet-loading thoracic spine."

Id.

On September 9, 2011, Plaintiff had a mass in his back removed. Id. at 465-66.

On October 5, 2011, Plaintiff completed an updated disability report. Id. at 184-88. Plaintiff wrote that he had a new condition since the last report, that he specified as "a knot on my shoulder blade that had to be removed." Id. at 184. At this time, Plaintiff's medications were Lortab, Opans, and Valium. Id. at 186. Plaintiff stated that "my wife has to help me out of bed, can't lift. I have to depend on my family." Id. Plaintiff also wrote that "I need injections from Dr Dozier but insurance does not cover enough for me to have them." Id. at 187.

On October 16, 2011, Plaintiff's wife completed a function report that Plaintiff was "no longer able to lift much at all. Standing is very painful and not able to lift, stand or sit for long periods of time." Id. at 189-96. She marked that Plaintiff was limited in his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, and get along with others. Id. at 194. She wrote, apparently from Plaintiff's perspective, "I can barely lift at all now. I am moody sitting or standing hurts. Reaching if it's heavy I can't bring it down. Bending get up is difficult. I start hurting and can't complete what I am doing." Id. Plaintiff's wife wrote that Plaintiff could walk for "about 60 yards" before he had to stop and rest for "about 3 min[utes]." Id. Plaintiff's wife wrote that Plaintiff used his brace "all the time." Id. at 195. Plaintiff's wife wrote that Plaintiff was taking two medications: Valium and Lortab. Id. at 196.

On October 28, 2011, Dr. Reeta Misra conducted a physical RFC assessment. Id. at 403-11. Plaintiff's evaluation was based on the primary diagnosis of "[disorder] neck/back." Id. at 403. Dr. Misra limited Plaintiff to lifting and/or carrying fifty pounds occasionally and twenty-five pounds frequently; standing and/or walking for about six hours total in an eight-hour workday; sitting for about six hours total in an eight-hour workday; and unlimited pushing and/or pulling. Id. at 404. Dr. Misra limited Plaintiff to frequently climbing ramps/stairs, climbing ladders/ropes/scaffolds,

balancing, stooping, kneeling, crouching and crawling. Id. at 405. Dr. Misra did not limit Plaintiff in his manipulative, visual, communicative, or environmental abilities. Id. at 406-07. Dr. Misra concluded:

> [Plaintiff] [a]lleges worsening. Initial: prepares simple meals, does some [household] chores, mows lawn, rides in car, shops, able to walk one block, uses cane. Recon[sideration]: prepares simple meals, does some laundry [with] help, rides in car, shops, able to walk 60 yards, uses cane. [Complains of] pain partially supported by imaging. [Right] shoulder knot appears stable without indication of any functional restrictions. There is no evidence of LL [established onset date]. Based on the [medical evidence of record], the symptoms are partially credible. The [medical evidence of record] does not support the allegation of worsening. The functional restrictions alleged are disproportionate to the clinical findings. Pain, weakness, fatigue have been considered singly, and combined, and are reflected in the RFC which the claimant appears fully capable of sustaining.

Id. at 410.

On November 2, 2011, Andrew Phay, Ph.D. conducted a mental evaluation of Plaintiff. Id. at 412. Dr. Phay noted that "[Plaintiff] has no new mental allegations, no allegation of mental worsening, and has had no additional mental treatment. ... [Plaintiff's] activities have not significantly changed[.]" Id. Dr. Phay concluded, "[a]dditional physical [medical evidence of record] does not reveal significant change in mental functioning, and current evidence does not warrant a change in the initial assessment. I have reviewed all of the evidence in the file and the assessment of 08/10/11 is hereby affirmed." Id.

On November 2, 2011, Jocelin Joyce of Disability Determination Services completed a vocational analysis. Id. at 208-10. Joyce limited Plaintiff to lifting a maximum of fifty pounds and twenty-five pounds frequently; standing/walking for six hours a day; and sitting for six hours a day. Id. at 208. Joyce limited Plaintiff to frequently climbing ramps/stairs, climbing ladders/ropes/scaffolds, balancing, stooping, kneeling, crouching, and crawling. Id. Plaintiff was

not given manipulative, visual, communicative, or environmental limitations. Id.

On November 3, 2011, Plaintiff's requested reconsideration of the denial of Social Security benefits was denied. Id. at 70-71 and 83-87. Plaintiff requested a hearing. Id. at 88-94.

On November 21, 2011, Plaintiff's wife completed an updated disability report. Id. at 211-18. Plaintiff's wife listed Plaintiff's three prescriptions: Lortab, Opana, and Valium. Id. at 213; and Plaintiff stated, "my wife works to take care of our family. She has to pull me out of bed, help me up and in and out of shower." Id. at 215. In "remarks," Plaintiff's wife wrote:

> In the letter of Denial you left out that in T3, T4, T5 he is rubbing bone on bone. He is not able to stand up for long periods of time nor sat down for a long period of time. Lifting anything heavy at all he can not do. I pull him out of the bed, I have to help him up from sitting position. Also how safe is he to work anywhere due to all the medication he takes to even be able to function just a little at home. My husband has not been able to work since 2008 if he was able trust me he would be doing so.

Id. at 217.

On November 30, 2011, Plaintiff returned to Pain Management of Middle Tennessee. Id. at 499-501. Plaintiff was prescribed Xanax, a sedative; Baclofen, a muscle relaxant; Oxymorphone, a narcotic pain medication; Lortab, another narcotic pain medication; and Valium, another sedative. Id. at 500. Plaintiff reported constant, sharp pain that he rated as ten out of ten. Id. at 501. Plaintiff reported that medication improved his pain level by seventy percent and improved his ability to complete activities of daily living. Id. On examination, Plaintiff was "ambulating normally" and had a "normal tandem gait test." Id. Plaintiff's neck had "pain with motion and [was] tender" and "tender in all planes with extremes of motion." Id.

On February 1, 2012, Plaintiff visited Pain Management of Middle Tennessee. Id. at 496-99. Plaintiff was prescribed Baclofen, a muscle relaxant; and Diazepam, a sedative. Id. at 497. Plaintiff

reported constant, sharp pain at a level of ten out of ten. Id. at 498. According to Plaintiff, this was a "particularly bad day," and his pain was "usually 4-5/10 with pain med[ications]." Id. at 499. Plaintiff reported that medication improved his pain level by seventy percent, and improved his ability to complete activities of daily living. Id. at 498. On examination, Plaintiff was "ambulating normally" and had a "normal tandem gait test." Id. Plaintiff's spine was "limited in all planes due to pain." Id. at 499.

On May 29, 2012, Plaintiff returned to Pain Management of Middle Tennessee. Id. at 493-96. Plaintiff "[complained of] mid back and neck pain." Id. at 494. Plaintiff was prescribed Tizanidine, a muscle relaxant. Id. Plaintiff reported constant, sharp mid-low back pain at a level of seven out of ten. Id. at 495. Plaintiff reported that medication improved his pain level by eighty percent and improved his ability to complete activities of daily living. Id. Plaintiff's neck was "pain[ful] with motion and tender" and "tender in all planes with extremes of motion." Id.

On July 25, 2012, Plaintiff returned to Pain Management of Middle Tennessee. Id. at 491-92. Plaintiff reported constant, sharp pain in his mid-low back at a level of five out of ten. Id. at 492. Plaintiff reported that medication improved his pain level by eighty percent, and improved his ability to complete activities of daily living. Id. On evaluation, Plaintiff was "ambulating normally and [had a] normal tandem gait test." Id. Plaintiff's neck was "tender" and he had "pain with motion." Id.

On August 29, 2012, Plaintiff visited Dickson Medical Associates. Id. at 468-71. Plaintiff presented to "discuss pain [management]." Id. at 468. According to Plaintiff, he was seeing Dr. Dozier in Clarksville for pain management, but that office was too far and he was late to appointments. Id. On this date, Plaintiff was prescribed Baclofen, a muscle relaxant; Lortab, a

narcotic pain medication; and Opana, another narcotic pain medication. Id. at 469.

On September 26, 2012, Plaintiff visited Pain Management of Middle Tennessee. Id. at 487-90. Plaintiff was prescribed Robaxin, a muscle relaxant; Mobic, an anti-inflammatory; Lortab, a narcotic pain medication; and Oxymorphone, another narcotic pain medication. Id. at 488. Plaintiff reported constant, sharp mid-low back pain at a level of eight out of ten. Id. at 489. Plaintiff reported that medication improved his pain by eighty percent and improved his ability to complete activities of daily living. Id. On examination, Plaintiff was in "moderate distress" and had "limited ambulation." Id. Plaintiff showed an "irregular gait" that was "antalgic." Id. at 490.

Plaintiff was given a drug test on his previous visit, and tested "[positive for] morphine; [negative] for oxymorphone." Id. Plaintiff "[s]tate[d] that [he] was out of oxymorphone but had a couple of morphine left in [an] old bottle, so [he] took [one] of those." Id. Plaintiff also stated that he "[w]as called in for pill count [and] arrived just as [the] window [was] being closed. State[d] that person [at the] window was rude [and] wouldn't allow pill count so [he] has been out of med[ications]." Id. The physician "[d]iscussed importance of compliance with random drug counts [and] adherence to prescribed med[ications]. Discussed that if [he] has any type of aberrant behavior asso[ciated] with compliance issues we will have to discharge him as a patient. [Plaintiff] [v]erbalizes understanding." Id.

On November 20, 2012, Plaintiff returned to Pain Management of Middle Tennessee. Id. at 484-87. Plaintiff "[complained of] middle [lower back pain]." Id. at 485. Plaintiff was prescribed Tramadol, a narcotic pain medication. Id. Plaintiff reported constant, sharp, tingling pain at a level of seven out of ten. Id. at 486. Plaintiff reported that medication improved his pain by sixty percent and improved his ability to perform activities of daily living. Id. On examination, Plaintiff was

"ambulating normally and [had a] normal tandem gait test." Id. Plaintiff's neck was "tender and pain[ful] with motion[.]" Id.

On January 23, 2013, Plaintiff returned to Pain Management of Middle Tennessee. Id. at 481-84. Plaintiff presented for follow up of "degeneration of thoracic or lumbar intervertebral disc; thoracic or thoracolumbar intervertebral disc," "cervicalgia," "lumbago," and "degeneration of cervical intervertebral disc." Id. at 482. Plaintiff was prescribed Lortab, a narcotic pain medication; Mobic, an anti-inflammatory; Oxymorphone, another narcotic pain medication; Robaxin, a muscle relaxant; and Tramadol, another narcotic pain medication. Id. Plaintiff reported a constant, sharp, tingling pain at a level of seven out of ten. Id. at 483. Medication improved Plaintiff's pain by sixty percent and improved his ability to complete activities of daily living. Id. On examination, Plaintiff was "ambulating normally," but his neck was "tender and [had] pain with motion." Id. Plaintiff reported that "he wants to have injections, but would have to pay out of pocket – insurance issues. Injections in the past have been helpful." Id. at 484. Plaintiff also brought with him a prescription for Lortab from his dentist that he did not fill; the physician destroyed the paper prescription. Id.

On March 6, 2013, Plaintiff returned to Pain Management of Middle Tennessee. Id. at 480-81. Plaintiff presented for follow up of "displacement of thoracic or lumbar intervertebral disc without myelopathy; thoracic intervertebral disc without myelotpathy," "degeneration of thoracic or lumbar intervertebral disc; thoracic or thoracolumbar intervertebral disc," "cervicalgia," and "degeneration of cervical intervertebral disc." Id. Plaintiff also "[complained of] neck/mid back pain." Id. On examination, Plaintiff was in "mild distress," and although he "ambulat[ed] normally," he had an "abnormal tandem gait test (unable to heel walk or tiptoe walk)." Id. at 481. Plaintiff's neck was "tender and pain[ful] with motion" and "tender in all planes with extremes of

17

motion." Id.

On April 12, 2013, Plaintiff's hearing for Social Security benefits was held before Administrative Law Judge ("ALJ") Brian Dougherty. Id. at 42.

On April 19, 2013, Dr. Damon Dozier of Pain Management of Middle Tennessee completed a medical opinion regarding ability to do work-related activities. Id. at 503-04. Dr. Dozier limited Plaintiff to lifting and carrying twenty pounds occasionally and ten pounds frequently; standing and walking for about four hours during an eight-hour workday; and sitting for about four hours in an eight-hour workday. Id. at 503. Dr. Dozier specified a sit/stand option for Plaintiff to sit thirty minutes before changing position; stand thirty minutes before changing position; and walk around every thirty minutes, for fifteen minutes. Id. Plaintiff required the ability to sit and stand at will. Id. Plaintiff also required the ability to sometimes lie down at unpredictable intervals during an eight-hour workday; this would happen "1-2 times." Id. This was based on Plaintiff's "cervical degenerative disc disorder." Id. Dr. Dozier limited Plaintiff to occasionally twisting, stooping (bending), crouching, climbing stairs, and climbing ladders. Id. at 504. Plaintiff's ability to reach (including overhead) and push/pull was limited because it "increase[d] pain." Id. Plaintiff should avoid concentrated exposure to extreme cold; extreme heat; high humidity; fumes, odors, dusts, gases; perfumes; soldering fluxes; solvents/cleaners; and chemicals. Id. In this section, "list other irritants or allergens" was also checked as "avoid concentrated exposure," but there were not any allergens written. Id. Dr. Dozier estimated that, on average, Plaintiff would be absent about three days per month. Id.

On May 8, 2013, the ALJ held a supplemental hearing to utilize Dr. Dozier's medical source statement in revised questions to the vocational expert. Id. at 27. On June 17, 2013, the ALJ

determined that Plaintiff was not disabled within the meaning of the Act and denied Plaintiff's request for Social Security benefits. Id. at 8-22. Plaintiff requested review of this decision. Id. at 6-7. Plaintiff's request for review was denied. Id. at 1-5.

## B. Conclusions of Law

A "disability" is defined by the Social Security Act as an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1); see also 42 U.S.C. § 1382c(a)(3). A reviewing court's evaluation of the Commissioner's decision is based upon the record made from the administrative hearing process. Jones v. Sec'y, Health and Human Servs., 945 F.2d 1365, 1369 (6th Cir. 1991). Judicial review is limited to determination of (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. Landsaw v. Sec'y of Health and Human Servs., 803 F.2d 211, 213 (6th Cir. 1986). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007) (quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)).

Plaintiff contends that the ALJ erred by: (1) incorrectly considering the opinion of Plaintiff's treating physician, Dr. Dozier; (2) failing to consider all of Plaintiff's impairments and their severity; and (3) failing to conduct a function-by-function analysis for the RFC.

Plaintiff asserts that the ALJ erred by failing to evaluate correctly the opinion of Plaintiff's

19

treating physician, Dr. Dozier. Plaintiff relies on Social Security Regulation 96-2p that states, "[i]f a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight; i.e., it must be adopted."

In the Sixth Circuit, "provided that they are based on sufficient medical data, 'the medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference.'" Howard v. Comm'r of Soc. Sec., 276 F.3d 235, 240 (6th Cir. 2002) (quoting Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985)). If the ALJ rejects the opinion of a treating source, he is required to articulate some basis for rejecting the opinion. Shelman v. Heckler, 821 F.2d 316, 321 (6th Cir. 1987).

Dr. Dozier treated Plaintiff at Pain Management of Middle Tennessee regularly between May 5, 2010 and March 6, 2013. The Commissioner does not contest the classification of Dr. Dozier as Plaintiff's treating physician.[2] When evaluating Dr. Dozier's opinion, the ALJ found:

> From an opinion standpoint, the undersigned generally affords great weight to Dr. Dozier's opinion with regard to the claimant's exertional, postural and environmental limitations. These functional assessments are generally consistent with his treatment records. However, no weight is given to the more speculative assessments in Dr. Dozier's opinion, such as Dr. Dozier's statement that the claimant would need to lie down 1-2 times a day and would be absent from work about three days a month. In addition[] to being speculative, these assertions are inconsistent with Dr. Dozier's treatment records showing reasonably good pain control, a general lack of side effects, and fairly benign examination findings.

(Docket Entry No. 10 at 19-20) (internal citation omitted).

In a April 19, 2013 medical source statement, Dr. Dozier opined that Plaintiff can lift and carry a maximum of twenty pounds occasionally and ten pounds frequently; can stand, walk, and sit

---

[2]Defendant stated, "[Dr. Dozier] regularly saw Plaintiff until November 2011 and then did not see Plaintiff again until March 2013." Yet Dr. Dozier treated Plaintiff regularly between November 2011 and March 2013. (Docket Entry No. 10 at 496, 493, 490, 487, 484, and 481).

about four hours in an eight-hour workday; sit for thirty minutes before changing position; stand for thirty minutes before changing position; walk around every thirty minutes for fifteen minutes and will need the opportunity to shift at will from sitting to standing or walking. Id. at 503. Dr. Dozier also checked "yes" to the question "will your patient sometimes need to lie down at unpredictable intervals during an 8 hour working shift" and noted that Plaintiff would need to do so "1-2 times" due to "cervical degenerative disc disease." Id.

Dr. Dozier also noted that Plaintiff was limited to occasionally twisting, stooping (bending), crouching, climbing stairs and climbing ladders due to "cervical degenerative disc disease." Id. at 504. Plaintiff was also limited in reaching (including overhead) and pushing/pulling, again due to "cervical degenerative disc disease" because "reaching pushing increase pain." Id. Dr. Dozier estimated that Plaintiff would be absent from work about three days per month. Id. This statement was after Plaintiff's first hearing before the ALJ, held on April 12, 2013. Id. at 42.

The ALJ held a supplemental hearing to consider Dr. Dozier's statement and questioned a vocational expert regarding the opinion. Id. at 27. At the supplemental hearing, Plaintiff's attorney stated that "Dr. Dozier would not fill out a medical source statement in the beginning because he was saying, you know, [Plaintiff is] not getting the stuff done, all the things I want [Plaintiff] to get done ... because of financial reasons ... [Plaintiff] has a good reason." Id. at 40. According to Plaintiff, he wanted to receive injections for his pain, but could not afford them.

The only impairment specifically listed by Dr. Dozier in his medical source statement is Plaintiff's cervical degenerative disc disease. Dr. Dozier diagnosed Plaintiff with "cervicalgia," "lumbago," "chronic pain due to trauma," and "displacement of thoracic or lumbar intervertebral disc without myelopathy; thoracic intervertebral disc without myelopathy." On January 23, 2013

and March 6, 2013, Dr. Dozier cited "degeneration of thoracic or lumbar intervertebral disc; thoracic or thoracolumbar intervertebral disc" and "degeneration of cervical intervertebral disc." Id. at 481-84 and 480-81. Plaintiff's degenerative disc disease was also diagnosed elsewhere: first, Plaintiff self-reported degenerative disc disease to the physicians at Dickson Medical Associates, then Dr. Dozier's office recorded that an "x-ray report from Horizon Medical Center from 12/27/10 reveals mild [degenerative disc disease] C5-6, C6-7." Id. at 479 and 314.

Prior to his April 19th medical statement, Dr. Dozier never issued any limitation to Plaintiff. Dr. Dozier noted that Plaintiff usually "ambulated normally" upon examination. Id. at 328, 325, 313, 376, 501, 498, 492, 486, 483 and 481. Plaintiff also reported to Dr. Dozier that medication decreased his pain level by at least fifty percent on almost all occasions. Id. at 324, 321, 318, 316, 376, 373, 501, 498, 495, 492, 489, 486 and 483. As stated by the ALJ, Dr. Dozier's limitations in the recent medical source statement are inconsistent with his treatment record of Plaintiff.

Under the Act's regulations, the ALJ is not required to give controlling weight to a treating physician's evaluation when that evaluation is inconsistent with other substantial evidence in the record. See 20 C.F.R. § 416.927(c)(2) and 20 C.F.R. § 404.1527(c)(2). When there is contradictory evidence, the treating physician's opinion is weighed against the contradictory evidence under the criteria listed above. Id. When the opinions are inconsistent with each other, the final decision regarding the weight to be given to the differing opinions lies with the Commissioner. 20 C.F.R. § 416.927(e)(2).

Yet, the ALJ must support his conclusion with substantial evidence in the record. "Without any explanation by the ALJ, it is unclear to the undersigned how [the record] undermines the entirety of Plaintiff's treating psychiatrist's opinion, provided nearly three years later. ... [T]he ALJ's failure

to cite to any particular portion of the treatment records hinders meaningful review by this Court." Evans v. Comm'r of Soc. Sec., — F.Supp.3d —, 2015 WL 4592449 at *5 (S.D. Ohio Aug. 18, 2015). The ALJ does not cite any record for his contention that "[i]n addition[] to being speculative, these assertions are inconsistent with Dr. Dozier's treatment records[.]" (Docket Entry No. 10 at 20). That is not sufficient reasoning to support the ALJ's conclusion. As stated by thte Eastern District of Michigan district court, "the ALJ failed to provide sufficient explanation for discounting the opinion of Dr. Tadeo. In doing so, she failed to cite any inconsistencies between the Mental Impairment Questionnaire and the treatment notes. ... The ALJ should have provided more detailed explanation regarding why Dr. Tadeo's opinion was given little weight. In addition, the ALJ should have provided an analysis of the relevant factors within 20 C.F.R. § 404.1527(c) detailing how much weight the opinion is entitled. Here, even if the ALJ's conclusion is ultimately justified, proper procedure must be followed." Pope v. Comm'r of Soc. Sec., 2013 WL 4084752 at *3 (E.D. Mich. Aug. 13, 2013) (internal citations omitted). As such, the Court concludes that the ALJ's opinion regarding Dr. Dozier's treating physician opinion is not supported by substantial evidence.

Plaintiff raises two additional issues. First, Plaintiff asserts that the ALJ erred by failing to consider Plaintiff's impairments in combination and by failing to provide sufficient reasons that Plaintiff's impairments were not severe. Plaintiff specifically cites to his diagnoses of depressive disorder, cervicalgia, displacement of thoracic or lumbar intervertebral discs, chronic pain syndrome and lumbago.

As to Plaintiff's depressive disorder, the ALJ stated that "[w]hile the claimant did not make significant allegations regarding mental illness, his treatment records do make scattered mentions of depression and anxiety[.]" (Docket Entry No. 10 at 14). Plaintiff's diagnosis of depressive

disorder was made by Dr. Dozier at the Pain Management of Middle Tennessee. Id. at 326, 323, 311 and 374. Plaintiff's medical record reflects a diagnosis of "[d]epressive disorder, not elsewhere classified (311) – according to our survey." Id. at 326, 323, 311 and 375. There was not any other medical provider that diagnosed Plaintiff with depressive disorder.

On July 27, 2011, Dr. Germek conducted an in-person interview with Plaintiff for a DDS psychological evaluation. Id. at 341-45. Although Dr. Germek listed "Depressive Disorder Not Otherwise Specified" in her diagnosis, she mentioned depression only once: "[Plaintiff] reports feeling somewhat depressed a few days a week and states he has been feeling this way since he hurt his back and has not been able to work consistently and provide for his family." Id. at 343. Dr. Germek also noted that according to Plaintiff, Plaintiff had never been hospitalized for mental health problems, had never seen a mental health professional for outpatient treatment, and had never taken any medications for psychiatric conditions. Id. at 342.

Dr. Davis also conducted a psychiatric records review. Id. at 350-62. Dr. Davis evaluated Plaintiff for "depressive [disorder]," but assigned Plaintiff only a "mild" limitation in Plaintiff's "difficulties in maintaining concentration, persistence, or pace." Id. at 360. Dr. Davis concluded, "Claimant has a depressive [disorder] by [history] but currently is euthymic. ... Clearly depression is not severe as claimant was euthymic." Id. at 362.

Dr. Phay noted that Plaintiff's mental condition had not changed since his last evaluation, and that the "[a]dditional physical [medical evidence of record] does not reveal significant change in mental functioning and current evidence does not warrant a change in the initial assessment." Id. at 412. In a word, Dr. Phay affirmed Dr. Davis' conclusions. Id.

The ALJ concluded that Plaintiff's treatment record demonstrated that Plaintiff's depressive

disorder was not severe, and that Plaintiff was not limited by depressive disorder in activities of daily living. Id. at 14-15. The Court concludes that the ALJ's conclusion is supported by substantial evidence.

Next, Plaintiff asserts that the ALJ did not properly consider his cervicalgia, displacement of thoracic or lumbar intervertebral discs, chronic pain syndrome and lumbago. Cervicalgia, chronic pain syndrome, and lumbago are all pain diseases. After thoroughly reviewing Plaintiff's medical reports, the ALJ determined that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms[.]" Id. at 16-19. Yet, the ALJ also determined that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible[.]" Id. Specifically regarding pain, the ALJ found:

> With respect to his pain, the records from Dr. Dozier suggest his pain is under better control than he alleges. Dr. Dozier's records show that his pain is significantly reduced with medication, based on multiple reports of such reduction during office visits. While the claimant had acknowledged some reduction of pain with medication, he also claimed that he had side effects from medication. Dr. Dozier's records confirmed that he had side effects from some of his medications, but he has not taken these medications in quite some time, the side effects were only briefly mentioned, and his current medications are not documented to cause such side effects. In fact, Dr. Dozier's records specifically disclaim side effects from the medications he has been on the longest, including notations that he does not have problems driving due to medication and does not have mental cloudiness with medication.

Id. at 19.

Plaintiff's record with Pain Management of Middle reflects that Plaintiff experienced a fifty percent or greater reduction in pain when taking medication. These records also reflect when Plaintiff complained of any side effect, he was immediately taken off of that medication. Plaintiff did not complain of side effects with any of his current medications. Thus, the Court concludes that

the ALJ could reasonably conclude that Plaintiff's pain diseases – cervicalgia, chronic pain syndrome, and lumbago – were adequately addressed with medication.

The ALJ, however, did not discuss Plaintiff's diagnosis of "displacement of thoracic or lumbar intervertebral discs." Plaintiff was diagnosed with this condition by Pain Management of Middle Tennessee, Dr. Dozier's office. Id. at 323, 320, 317, 314, 311, 374, 371 and 480. The ALJ erred by failing to consider this impairment.

Finally, Plaintiff asserts that the ALJ erred by failing to provide a function-by-function assessment in the RFC. Plaintiff cites SSR 96-8p that provides "[t]he RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545 and 416.945. Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." The assessment of physical abilities includes "sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching)[.]" 20 CFR 404.1545(b). The ALJ's RFC included restrictions for sitting, standing, walking and lifting, in addition to mental, postural and environmental limitations. (Docket Entry No. 10 at 15). The ALJ, however, did not include a restriction for carrying, or for pushing and pulling.

Yet, several evaluators concluded that Plaintiff was not limited in his ability to push and pull. On June 24, 2011, Dr. Pelmore conducted a records review and marked "unlimited" on Plaintiff's push and/or pull restrictions. Id. at 332. On August 11, 2011, examiner T. Driver was instructed to "check ONLY restricted items," and did not mark the section for pushing and pulling. Id. at 181. On October 28, 2011, Dr. Misra also marked "unlimited" for Plaintiff's push and/or pull restrictions.

Id. at 404.

The only physician to assign a push and pull restriction was Dr. Dozier in his medical source statement. Id. at 504. As discussed previously, this assessment was not sufficiently considered. If the ALJ determines that the medical source statement is credible, the push/pull restriction should be reconsidered when assigning the revised RFC. The ALJ also failed to establish a carrying restriction, and will need to do so upon reconsidering the RFC.

For these reasons, the Court concludes that the action should be remanded for reconsideration of Dr. Dozier's medical source statement, for consideration of Plaintiff's diagnosed condition of "displacement of thoracic or lumbar intervertebral discs" and any necessary revision to Plaintiff's RFC.

An appropriate Order is filed herewith.

**ENTERED** this the _20th_ day of January, 2016.

WILLIAM J. HAYNES, JR.
Senior United States District Judge